**STATE of Missouri, Respondent,**

v.

**Ralph Louis VOLLMAR, Appellant.**

No. 50458.

Supreme Court of Missouri,

Division No. 1.

March 8, 1965.

Motion for Rehearing or for Transfer to
Court En Banc Denied April 12, 1965.

Thomas F. Eagleton, Atty. Gen., John H. Denman, Asst. Atty. Gen., Jefferson City, for respondent.

Morris A. Shenker, Bernard J. Mellman, Emanuel Shapiro, John L. Boeger, St. Louis, for appellant.

HOLMAN, Judge.

Defendant was charged with and found guilty of the offense of knowingly possessing certain obscene publications with intent to sell and circulate the same and the jury fixed his punishment at a fine of $1,000. See § 563.280, Laws of Mo. 1961, p. 335, and V.A.M.S. He has appealed from the ensuing judgment.

■ We have jurisdiction of this appeal (although the offense is a misdemeanor) because questions have been presented which involve the construction of certain constitutional provisions. Mo.Const. Art. V, § 3 (1945), V.A.M.S.

The State's evidence will support the following statement of facts: On March 21, 1963, Detective Jimmy Webb and Frederick Fry were members of the liquor and morality section of the vice squad of the St. Louis Police Department. At about 10:30 a. m. on that day they went to the "House of Publications," located at 719 Pine Street. After entering the establishment they contacted defendant (who was the store manager) and one of them told defendant that they were "gong to have a stag party, and needed some pictures to get the interest of the males at the party." Detective Webb also pointed to a particular magazine lying on the counter, "Sun Fun," wrapped in cellophane, and said that he wanted it. Defendant then obtained a copy of that magazine from under the counter, opened it, and said, "This has real nudes in it, and shows everything." The detectives then looked at the magazine and saw that it contained pictures of nude women which "showed everything," and Detective Webb purchased it for $2.00. The officers then identified themselves and placed defendant under arrest. They called in another officer who was waiting on the outside and the three of them searched the store for other similar publications. They siezed a number, most of which were in the room in which the business was conducted, although there were a few obtained from the basement.

At the trial the following publications which were seized on the occasion in question were offered and admitted in evidence: "Sun Fun," No. 3, one copy; "SunDeck," April 1963, 8 copies; "Nudists' Leisure," 3 copies; "Sun and Health," April 1963, 7 copies; "Gymnos Sundeck," No. 124, 7 copies; "Tidlosa," No. 5, 5 copies; "International Nudistour Guide," Vol. I, No. 2, 3 copies; "National Nudist," Vol. I, No. 3, 9 copies. All are magazine-type publications (sometimes herein referred to as books). Four of the publications are 7 X 9 inches and the remainder are 9 X 11 inches in size.

Prior to the admission of these exhibits in evidence, Detective Webb identified them. It was developed in his testimony that each of these publications contained photographs of nude men and women. Detective Fry stated that after defendant was arrested he admitted that he knew what was in the magazine he had sold them. Upon cross-examination of Detective Webb defendant elicited the testimony that there were thousands of books and magazines of various kinds in the store in question. Also, upon cross-examination, Detective Fry stated that he had seen nude pictures and statues at the Art Museum.

It was stipulated at the trial that the jury utilized 25 minutes in its examination of the exhibits.

Defendant offered to produce two witnesses to testify as experts, and when the court ruled that the issue was not a proper

matter for expert testimony the defendant made an offer of proof to produce Barney Whippold of the St. Louis Globe-Democrat who would testify that he had been a newspaper reporter for 32 years, had done extensive reading, had taken several courses in literature, and that, based upon his experience and his travels, it was his opinion that the magazines in question would conform to the general community standards of the State of Missouri and were not obscene. A similar offer was made in regard to testimony which it was said would be given by Donald Finke who was a photographer with 22 years' experience. An objection to the proffered testimony was sustained.

Other evidence will be stated in the course of the opinion.

Defendant's first contention is that the court erred in overruling his motion to suppress evidence and in admitting in evidence the publications in question. His reasons for that contention are that "(a) the officers seizing the exhibits had no search warrant and were provided with no guide to the exercise of informed discretion in determining which magazines were obscene and subject to seizure and hence the search and seizure of the exhibits contravened appellant's rights to freedom of speech under Art. I, § 8, Mo.Const.1945, and the First and Fourteenth Amendment to the Federal Constitution; and (b) the search of appellant's establishment was a general exploratory search for evidence and not incidental to the arrest (even if the arrest were valid) and accordingly the search and seizure contravened appellant's right to be free from unreasonable searches and seizures in violation of Art. I, § 15, Mo.Const.1945 and the Fourth and Fourteenth Amendment to the Federal Constitution."

The evidence adduced on the motion to suppress was substantially the same as that given at the trial with the following additional evidence: There was testimony that on March 12, 1963, Detectives Webb and Fry visited the book store managed by de-

fendant and purchased a magazine, "Conqueress Club," and five pictures. This material was submitted to Mr. Freeman, City Counsellor, who advised them that such was obscene. They returned to the store the next day and purchased "Western Nudist," Vol. 1. While this publication was not placed in evidence, we think it is reasonable to assume that it was similar to the eight nudist magazines admitted in evidence at the trial. The officers were on night duty at that time so they placed this publication in a safe and, on March 20, when they were again working on the day shift, they took it to Mr. Freeman and also to Mr. Vettori, associate prosecuting attorney, and each of those officials advised them that "Western Nudist" was obscene. The arrest of defendant and the search of the premises occurred the next day.

■ It is well established that "only 'unreasonable searches and seizures' are within the constitutional prohibition. Art. 1, § 15, Const. V.A.M.S.; State v. Watson, 329 Mo. 158, 44 S.W.2d 132; State v. Egan, Mo.App., 272 S.W.2d 719. 'All illegal searches and seizures are "unreasonable" under the constitutional provisions, while lawful ones are reasonable.'" State v. Cohn, Mo.Sup., 347 S.W.2d 691, 695. And, it is elementary that an officer may make a lawful arrest without a warrant. The general rule is that he may arrest without a warrant any person whom he has reasonable cause to believe has committed a felony and anyone committing a misdemeanor in his presence. State v. Berstein, Mo.Sup., 372 S.W.2d 57; State v. McBride, 327 Mo. 184, 37 S.W.2d 423. And the rule has been liberalized by § 84.090 (all statutory references are to RSMo 1959, V.A.M.S., unless otherwise indicated) in that police officers of the City of St. Louis are authorized to arrest without a warrant any person whom they have reasonable grounds to believe has committed a misdemeanor even though such does not occur in the presence of the officer. State v. Humphrey, 358 Mo. 904, 217 S.W. 2d 551.

Assuming, as we hereinafter decide, that "Sun Fun" was obscene, there can be no doubt but that the arrest in this instance was lawful. The officers had seen that publication in the possession of defendant, who obviously intended to sell it, and, in fact, defendant did sell it to them shortly thereafter. Thus, two offenses under the provisions of § 563.280 had apparently been committed by defendant in the presence of the officers.

It is a settled rule in this state that when a defendant has been lawfully arrested a search may be made of his person and of the premises where he was arrested without the necessity of a search warrant. State v. Carenza, 357 Mo. 1172, 212 S.W.2d 743. And the Supreme Court of the United States has said that "the right without a search warrant contemporaneously to search persons lawfully arrested while committing crime and to search the place where the arrest is made in order to find and seize things connected with the crime as its fruits or as the means by which it was committed, as well as weapons and other things to effect an escape from custody is not to be doubted." Agnello v. United States, 269 U.S. 20, 46 S.Ct. 4, 5, 70 L.Ed. 145. The quoted rule has been approved in Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543, United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653, and Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399.

The statute in question provides that every person who "knowingly shall * * * have in his possession, with intent to sell or circulate * * * any obscene, lewd, licentious, indecent or lascivious book, pamphlet * * *." § 563.280. The State, in this instance, has treated the possession of obscene magazines as one offense regardless of the number of different publications involved. It therefore was reasonable for the officers, after arresting defendant, to make a search of the premises under defendant's control in order to obtain publications similar to the one purchased as additional evidence of the offense. We can see no basis for defendant's contention that the search was merely a general exploratory search for evidence of other offenses. The cases cited in that connection involve extensive, unreasonable, and unrestrained searches as appears in Kremen v. United States, 353 U.S. 346, 77 S.Ct. 828, 1 L.Ed.2d 876, and United States v. Lefkowitz, 285 U.S. 452, 52 S.Ct. 420, 76 L.Ed. 877.

In support of his contention that the instant search violated constitutional safeguards, as stated in (a) supra, the defendant relies primarily upon Marcus v. Search Warrants, 367 U.S. 717, 81 S.Ct. 1708, 6 L.Ed.2d 1127, and A Quantity of Copies of Books v. State of Kansas, 378 U.S. 205, 84 S.Ct. 1723, 12 L.Ed.2d 809. Marcus arose under Missouri statutes, § 542.380 et seq., which specifies a procedure whereby a search warrant may be issued upon complaint of an officer for various items, including obscene publications, and, if such are seized, after a hearing following notice to persons claiming an interest in the property, the court may order same destroyed. In Marcus, search warrants were issued and the officers seized all publications which they considered obscene which totaled approximately 11,000 copies of 280 different publications. Upon the hearing of the motions to quash the search warrants and for return of the property, the circuit court ruled that 100 of the publications were obscene and should be held as evidence for possible criminal prosecution and thereafter destroyed. The remaining 180 publications were ordered to be returned forthwith to the rightful owners. This court affirmed, 334 S.W.2d 119, and thereafter the cause reached the Supreme Court of the United States where the judgment was reversed. In so ruling that court said: "We believe that Missouri's procedures as applied in this case lacked the safeguards which due process demands to assure nonobscene material the constitutional protection to which it is entitled. * * * The warrants gave the broadest

discretion to the executing officers * * * and left to the individual judgment of each of the many police officers involved the selection of such magazines as in his view constituted 'obscene * * * publications.' * * * They were provided with no guide to the exercise of informed discretion, because there was no step in the procedure before seizure designed to focus searchingly on the question of obscenity.

* * * In consequence there were suppressed and withheld from the market for over two months 180 publications not found obscene. The fact that only one-third of the publications seized were finally condemned strengthens the conclusion that discretion to seize allegedly obscene materials cannot be confided to law enforcement officials without greater safeguards than were here operative. Procedures which sweep so broadly and with so little discrimination are obviously deficient in techniques required by the Due Process Clause of the Fourteenth Amendment to prevent erosion of the constitutional guarantees." 81 S.Ct. 1716, 1717.

The Kansas case involved statutory procedures very similar to those involved in Marcus. It was a proceeding instituted for the purpose of destroying certain paperback novels alleged to be obscene. Before issuing a search warrant the district judge examined seven books and found that they appeared to be obscene. The search warrant authorized seizure of 59 titles, all of which came in the grouping of "Nightstand Books." The sheriff found 31 of the titles on the premises involved and seized all copies thereof, a total of 1,715 books. Ten days later a hearing was held and the books were ordered destroyed. The Kansas Supreme Court affirmed. 191 Kan. 13, 379 P.2d 254. The Supreme Court of the United States reversed. That court stated that for the same reasons outlined in Marcus, "we hold that since the warrant here authorized the sheriff to seize all copies of the specified titles, and since P–K [News Service] was not afforded a hearing on the question of the obscenity even of the seven

novels before the warrant issued, the procedure was likewise constitutionally deficient." 84 S.Ct. 1725.

We should also mention the case of Kingsley Books, Inc. v. Brown, 354 U.S. 436, 77 S.Ct. 1325, 1 L.Ed.2d 1469. In that case the court sustained a New York statute which afforded injunctive relief (and subsequent destruction) against the sale of allegedly obscene publications which provided for a hearing within one day after joinder of issue and a decision within two days after the conclusion of the trial.

The Marcus and Kansas cases are to be readily distinguished from the case at bar. They are cases wherein the primary object was to seek authority to destroy large quantities of books. The books were seized and held for a considerable period of time before there was a proper judicial determination of the issue of obscenity. The Supreme Court was concerned about the fact that constitutional safeguards were not provided to protect nonobscene publications from being seized and thus withheld from dissemination. The instant case involves a prosecution for violating a criminal statute and hence there were the usual constitutional protections that are afforded all defendants in that type of case. This distinction is clearly pointed out in the dissenting opinion of the Chief Justice in Kingsley, as follows:

"This is not a criminal obscenity case. Nor is it a case ordering the destruction of materials disseminated by a person who has been convicted of an offense for doing so, as would be authorized under provisions in the laws of New York and other States. It is a case wherein the New York police, under a different state statute, located books which, in their opinion, were unfit for public use because of obscenity and then obtained a court order for their condemnation and destruction. The majority opinion sanctions this proceeding. I would not. Unlike the criminal cases decided today, this New York law places the book on trial. There is totally lacking any standard in the statute for judging the book in context.

The personal element basic to the criminal laws is entirely absent. In my judgment, the same object may have wholly different impact depending upon the setting in which it is placed. Under this statute, the setting is irrelevant.

"It is the manner of use that should determine obscenity. It is the conduct of the individual that should be judged, not the quality of art or literature. To do otherwise is to impose a prior restraint and hence to violate the Constitution. * * *" 77 S.Ct. 1330.

■ Also in the case under review it is apparent that the officers were provided with a guide to aid them in exercising an informal discretion in determining which publications should be seized as obscene. Prior to making the arrest they submitted "Western Nudist" to two attorneys entrusted· with law enforcement duties and were advised that it was obscene. It is significant therefore that when they made the search of the defendant's business quarters the only publications seized were nudist magazines which were undoubtedly similar to "Western Nudist." Moreover, in this case, only 44 publications were taken (a reasonable number for use in evidence) and such could not greatly impair the right of free dissemination of printed matter as distinguished from Kansas (1,715 books) and Marcus (which involved 11,000 copies).

We accordingly rule that the search in this case was a reasonable search following a lawful arrest and hence the trial court did not err in overruling the motion to suppress and in subsequently admitting the publications in evidence.

■ Defendant has also briefed the contention that the court erred in overruling his motions for judgment of acquittal "because the magazines were not obscene, and accordingly prosecution is barred by Art. I, § 8, Mo.Const.1945, and the First and Fourteenth Amendments to the Federal Constitution relating to freedom of speech and due process of law." In our consideration of the issue presented we should apply certain established principles. Some of those principles are stated in the leading case of Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957), as follows: "The protection given speech and press was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people. * * * All ideas having even the slightest redeeming social importance—unorthodox ideas, controversial ideas, even ideas hateful to the prevailing climate of opinion—have the full protection of the guaranties, unless excludable because they encroach upon the limited area of more important interests. But implicit in the history of the First Amendment is the rejection of obscenity as utterly without redeeming social importance. This rejection for that reason is mirrored in the universal judgment that obscenity should be restrained * * *. We hold that obscenity is not within the area of constitutionally protected speech or press. * * * However, sex and obscenity are not synonymous. Obscene material is material which deals with sex in a manner appealing to prurient interest. The portrayal of sex, e. g., in art, literature and scientific works, is not itself sufficient reason to deny material the constitutional protection of freedom of speech and press." 77 S.Ct. at pages 1308, 1309, 1310. And the approved test is "whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest." 77 S.Ct. 1311. We conclude from later decisions of the Supreme Court of the United States that "community," as the word is used in determining standards of decency, does not mean the local area involved but relates to a national standard. Manual Enterprises, Inc. v. Day, 370 U.S. 478, 82 S. Ct. 1432, 8 L.Ed.2d 639; Jacobellis v. State of Ohio, 378 U.S. 184, 84 S.Ct. 1676, 12 L. Ed.2d 793.

■ In cases in which fact questions are submitted to a jury, appellate review

of the fact issues is ordinarily limited to a determination of whether there was substantial evidence from which the jury could reasonably have found the facts in question. However, we accept the now prevailing view that in obscenity cases the issue for determination is subject to constitutional limitations and the courts are faced with an obligation to make an independent determination of the constitutional issue which cannot be avoided by considering "obscenity" as a fact question only. See "Censorship of Obscenity," 45 Minn.Law Review 114. We will accordingly make our own determination of the mixed question of law and fact as to whether the publications in question are obscene.

 It is impractical to attempt a detailed description of all of the publications we are called upon to review. In that connection we have in mind that they cannot be judged by one or more isolated photographs but must be judged as a whole. However, we will endeavor to ascertain the dominant theme or effect of each publication because we have the view that the dominant theme is entitled to great weight in determining the character of the entire publication. We also state at the outset that there is no contention that the printed passages in the books are objectionable. All of the books purport to describe nudist organizations and to advocate the practice of nudity. However, we have concluded from an examination of the contents and arrangement of these books that the advocacy of nudity therein is a mere pretext or feint whereby publishers and distributors of obscene publications seek to avoid successful prosecution and punishment under obscenity statutes such as the one under consideration.

 All of the books are replete with actual photographs of nude persons of both sexes, many of which clearly depict both male and female genitalia, including the pubic hair. Some of the pictures show nude persons of all ages engaged in the normal group activities that apparently char-acterize the usual nudist park. However, predominating in all of these publications are close-up photographs of attractive, shapely, young women, most of whom apparently range in age from 16 to 25 years. These photographs are posed so as to portray both the face and figure of these young women in a most alluring manner. Most of those photographs are of the front view and, as stated by one of the witnesses, "show everything." Some show one nude woman on a double page in order to depict a closer view of her body than could be done on one page. See, for example, "National Nudist," pages 27, 28. While these are not necessarily poses suggestive of sexual intercourse, one would be naive indeed to conclude that pictures of that type would not arouse the prurient interest of the average man. A considerable number of the photographs are in color which, of course, make the nude persons appear more natural and would likely increase the prurient appeal. It is obvious that defendant considered that the publications in question would have a special appeal to his customers because all of them have a price mark on the front cover which is twice the price quoted on an inside page. Also, it occurs to us that "Tidlosa," printed entirely in a foreign language, apparently Danish, would not be distributed in the United States in order to advance the practice of nudism because only a very small number of our people could read the printed message. Pictures, on the other hand, are universally understood, and the prurient appeal of those in "Tidlosa" would be the same as in any of the other books. We also note that on page 37 of "SunDeck" there is a close-up photograph of a young man and young woman facing the camera with the sex organ of the male in a condition of erection.

While no doubt there are some people who sincerely believe that the practice of nudism is beneficial and desirable, it is unquestioned that we live today in a clothed civilization and the average normal American (regardless of where he may reside), except for legitimate works of art, etc., re-

gards complete nudity, especially when it brazenly exhibits the adult male and female genitalia, as shocking, vulgar, and indecent. We have considered each of the exhibits in this case in its entirety and have concluded that each must be characterized as obscene. The dominant theme of each is to display the sex organs and nude bodies of attractive young people in a manner that will appeal to the prurient interest of the average person (applying contemporary community standards) in this nation. We accordingly rule that the trial court did not err in overruling defendant's motions for judgment of acquittal.

■ Defendant has also briefed the contention that the court should have sustained his motion for a judgment of acquittal because there was no proof of scienter as required by § 563.280. This contention is based primarily upon the premise that defendant could not have known that the magazines were obscene until there had been a prior adversary proceeding establishing such obscenity. We have already held that the ruling in the Kansas case is not applicable to the situation presented in the case at bar. Here there was ample evidence from which the jury could reasonably have found that defendant had knowledge concerning the obscene nature of the magazines in his possession. When he sold "Sun Fun" to the officers he pointed out that it had pictures of "some real nude women" in it. Each of the other publications seized by the officers had a picture of a nude woman on the outside front cover and most of them also had one on the outside back cover. One could not have had possession of such a publication without possessing some knowledge as to the nature of its contents. The evidence was sufficient to comply with the requirements set out in Smith v. California, 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed. 2d 205. We rule this point against defendant.

■ Instruction No. 2 is an instruction which defines various words contained in the main verdict-directing Instruction No.

1. We agree with the contention of defendant that it is reversibly erroneous. This for the reason that the definition of "obscene" includes the word "indecent" and the definition of "indecent" includes the following: "that which would arouse lewd and lascivious thoughts in the susceptible." Therefore, the jurors could have found that the magazines in evidence were obscene if they concluded that such would arouse the prurient interest of the susceptible. That is not in accord with the test specified in Roth, supra. To the extent that our ruling may conflict with State v. Becker, 364 Mo. 1079, 272 S.W.2d 283, that case should no longer be followed.

■ Since this cause must be reversed and remanded, we need not actually decide defendant's contention that Instruction No. 1 is erroneous. We note, however, that the instruction does not make it clear that the publications should be considered as a whole, and that a finding of obscenity should be based on a determination of whether, applying contemporary community standards, the material would appeal to the prurient interest of the average person. Prior to another trial counsel for the State should redraft that instruction so that it will comply with the views herein expressed.

■ One other point should be considered because it may arise in the event the case is tried again. Defendant contends that the court erred in excluding his proffered expert testimony to the effect that the publications would conform to general community standards and were not obscene. The court, in excluding that testimony, followed our case of State v. Becker, supra, wherein we held that such testimony was not within the proper scope of expert testimony. We have reexamined our decision in Becker and have considered the fact that many courts have admitted expert testimony, especially on the issue as to the literary or artistic value of publications alleged to be obscene. We have concluded, however, that on the issue of community stand-

ards and obscenity, the ruling in Becker is correct and that the trial court did not err in following it. In recent years there has been wide dissemination of knowledge by the press, radio and television. Most of our citizens have traveled rather extensively. Judges and jurors certainly have knowledge concerning the general community standards relating to moral conduct and obscenity. In the field of obscenity the average citizen is as capable of judging a publication as an alleged expert. Moreover, if the witnesses had been permitted to give an opinion as to whether the magazines were obscene they would have invaded the province of the jury by expressing an opinion on one of the essential ultimate facts to be determined by it. See Gillmore v. Atwell, Mo.Sup., 283 S.W.2d 636 [6].

The judgment is reversed and cause remanded for a new trial.

All concur.