STATE of Missouri, Respondent,

v.

Herbert Paul HARTSTEIN, Appellant.

No. 54377.

Supreme Court of Missouri,
En Banc.

April 12, 1971.

Rehearing Denied May 10, 1971.

John C. Danforth, Atty. Gen., Dale L. Rollings, Asst. Atty. Gen., Jefferson City, for respondent.

Irl B. Baris, Leonard J. Frankel, Newmark & Baris, St. Louis, for appellant.

STOCKARD, Commissioner.

Defendant was charged with and found guilty of "wilfully, unlawfully and knowingly have[ing] in [his] possession obscene, lewd, licentious, indecent and lascivious pictures with intent to publish and circulate said pictures by projecting the aforesaid pictures on a screen before divers persons" in violation of § 563.280 (all statutory references are to RSMo 1969, V.A.M.S.). He has appealed from the ensuing judgment.

We have jurisdiction of this appeal, although the offense is a misdemeanor, because questions are presented which involve the construction of certain constitutional provisions.

After four police officers had observed the showing at the Olympic Drive-In Theater in St. Louis County of the moving picture entitled "Night of Lust," they arrested the defendant and seized the film. Defendant waived trial by jury and was tried by the court which found that the dominant theme of the motion picture, taken as a whole, appealed to the prurient interest in sex; that it is patently offensive and affronts contemporary community standards relative to the description or representation of sexual matters; that it is utterly without redeeming social value; that it is obscene; that defendant had possession of the motion picture film before it was shown to the public and was aware of its contents, and that he caused it to be shown to the public who were present at the theater.

Defendant first contends that § 563.280 does not make illegal the showing of an obscene motion picture because it does not specifically refer to motion pictures. We do not agree. The statute proscribes the possession with intent to circulate, and the distribution or circulation of, "any obscene, lewd, licentious, indecent or lascivious * * * picture, photograph * * * print * * * or other publication of indecent, immoral or scandalous character * * *." A motion picture "consists of a series of photographs showing the objects in a scene in successive positions, slightly changed. When the series is presented in rapid succession, the optical effect is of a picture in which the objects move." Time Incorporated v. Bernard Geis Associates et al., D.C., 293 F.Supp. 130. See also, United States v. Peller, 2d Cir., 170 F.2d 1006.

Defendant next asserts that his trial and conviction subjected him to double jeopardy. Certain additional facts are necessary. Prior to the trial in which defendant was found guilty, he was tried before a jury. That trial ended in a mistrial when the jury failed to reach a verdict. At the close of the State's evidence

in that trial the defendant moved for a judgment of acquittal, and during the discussion between counsel and the court, the trial judge apparently made a statement, as stated by counsel for defendant in the subsequent trial, to the effect that "he would not say as a matter of law that the movie was obscene, and he could not say that the movie was not obscene, but he did overrule the motion for judgment of acquittal." Proof was not made in the subsequent trial of the precise comment of the trial judge, but the proof, if it can be called that, consisted only of the above statement by defendant's counsel made in argument as to his recollection as to what was said. Counsel for the State indicated that his recollection was that "I believe the judge indicated he felt he personally couldn't say one way or the other whether it was obscene." Defendant now argues that in the previous trial the court was required to make an independent determination that the motion picture was obscene, and when the court indicated that it could not so find, the defendant at that point should have been acquitted, and any further proceedings, including the subsequent trial at which he was found guilty, constituted double jeopardy.

Aside from the failure of proof as to the ruling of the trial court, if the comment was a ruling, the contention is without merit. In State v. Vollmar, Mo., 389 S.W. 2d 20, this court stated that "we accept the now prevailing view that in obscenity cases the issue for determination is subject to constitutional limitations and the courts are faced with an obligation to make an independent determination of the constitutional issue which cannot be avoided by considering 'obscenity' as a fact issue only," and that this court would "make * * * [its] determination of the mixed question of law and fact as to whether the publications in question are obscene." In the first trial, if the court should have but failed to determine the issue of whether the motion picture was obscene prior to submission to the jury, it was at most a trial error. If the jury had returned a verdict of guilty (instead of failing to reach a verdict with the resulting mistrial) and an appeal had been taken, the reviewing court would have, upon the issue being raised, made its own determination of the question of obscenity. Therefore, the trial error in the first trial, if it was error, and the resulting mistrial by reason of the failure of the jury to reach a verdict, does not result in the defendant being twice placed in jeopardy for the same offense in the constitutional sense.

■ Defendant next contends that it was error to admit into evidence the film of the motion picture "Night of Lust," and for the trial court to view it, because it was illegally seized by the arresting police officers without a warrant. Defendant relies on Marcus v. Search Warrants, etc., 367 U.S. 717, 81 S.Ct. 1708, 6 L.Ed.2d 1127; A Quantity of Copies of Books v. State of Kansas, 378 U.S. 205, 84 S.Ct. 1723, 12 L. Ed.2d 809; and Lee Art Theatre, Inc. v. State of Virginia, 392 U.S. 636, 88 S.Ct. 2103, 20 L.Ed.2d 1313.

In State v. Vollmar, supra, this court considered in detail the scope and effect of the rulings in the Marcus and Copies of Books cases. It was there pointed out that those were cases wherein the primary object was to seek authority to destroy as obscene large quantities of books, and that the United States Supreme Court was concerned that constitutional safeguards were not provided to protect nonobscene publications from being seized and thus withheld from dissemination. The result of those cases was that in such a proceeding, before the seizure can be made, there must be an adversary hearing on the issue of obscenity. Defendant contends in this case that such an adversary hearing was required before the film could be seized as an incident to a lawful arrest. This question was considered at length in Bazzell v. Gibbens, D.C., 306 F.Supp. 1057, and we agree with the result there reached. In that case the defendants were charged in a state court with the possession and exhibition of an obscene motion picture.

They sought relief in the Federal court on the basis that the seizure of the film was unlawful without the prior adversary hearing on the issue of obscenity. The court held: "The question before us now is * * * whether or not the State, through its District Attorney, had a right to seize the film in question prior to holding an adversary hearing on the question of its obscenity. The Court is not unmindful of the decision in A Quantity of Copies of Books v. Kansas, 378 U.S. 205, 84 S.Ct. 1723, 12 L.Ed.2d 809 (1964), wherein the United States Supreme Court held that the seizure there involved did violence to the First Amendment and that thus, in the absence of a pre-seizure adversary hearing, the seizure in that particular case was unconstitutionally impermissible. This Court is also cognizant of the fact that the Fourth and Seventh Circuit Courts of Appeal in Tyrone, Inc. v. Wilkinson, 410 F.2d 639 (CA4—1969), and Metzger v. Pearcy, 393 F.2d 202 (CA7—1968), saw fit in those particular cases to conclude that the decision in *A Quantity of Books* was controlling. I do not so find in the present case. I find nothing in the case law to indicate that in every case where a seizure of alleged obscene material is to be made, a pre-seizure adversary hearing is constitutionally required. Whether or not such a hearing is required must depend upon the nature and purpose of the seizure. If the seizure is made for the purpose of destroying the thing seized and for the purpose of preventing the dissemination of the material involved, then *A Quantity of Books* teaches that an adversary hearing prior to the seizure and/or destruction of the material is required in order not to run afoul of the First Amendment guarantee to the right of freedom of expression. But where, as here, a single copy of a film is seized for the sole purpose of preserving it as evidence to be used in a criminal action to be brought pursuant to a State statute already held, in all respects pertinent hereto, to be constitutional on its face, * * * such a seizure cannot be said to be violative of the First Amendment's

guarantees albeit a side effect of such a seizure coincidentally prevents that one particular copy of the film from being further disseminated pending the outcome of the criminal proceedings." We conclude that for the reasons set forth in State v. Vollmar, supra, and Bazzell v. Gibbens, supra, the rules announced in the Marcus and Copies of Books cases do not control.

Lee Art Theatre, Inc. v. State of Virginia, supra, presents a different problem. In that case the operator of a motion picture theater was convicted of possessing and exhibiting lewd and obscene motion pictures in violation of a statute somewhat similar to § 536.280. The films were seized under the authority of a warrant issued by a justice of the peace "on the basis of an affidavit of a police officer which stated only the titles of the motion pictures and that the officer had determined from personal observation of them and of the billboard in front of the theatre that the films were obscene." It was held in a per curiam opinion that "The admission of the films in evidence requires reversal of petitioner's conviction. A seizure of allegedly obscene books on the authority of a warrant 'issued on the strength of the conclusory assertions of a single police officer, without any scrutiny by the judge of any materials considered * * * obscene,' was held to be an unconstitutional seizure in Marcus v. Search Warrant[s, Inc.], 367 U.S. 717, 731–732, 81 S.Ct. 1708, 6 L.Ed.2d 1127, 1135, 1136. * * * The procedure under which the warrant issued solely upon the conclusory assertions of the police officer without any inquiry by the justice of the peace into the factual basis for the officer's conclusions was not a procedure 'designed to focus searchingly on the question of obscenity,' * * * and therefore fell short of constitutional requirements demanding necessary sensitivity to freedom of expression."

In this case the film was seized by the police officers following an arrest made on the basis that a misdemeanor had been committed in their presence. Defendant

had and exercised the immediate remedy, pursuant to Supreme Court Rule 33.03, V.A.M.R., of a motion to suppress the film as evidence and for its return on the basis that it was not obscene. The hearing on the motion provided a procedure "designed to focus searchingly on the question of obscenity" and gave effect to the "constitutional requirements demanding necessary sensitivity to freedom of expression." In Kingsley Books, Inc. v. Brown, 354 U.S. 436, 77 S.Ct. 1325, 1 L.Ed.2d 1469, the Supreme Court upheld an injunctive procedure designed to prevent the sale of obscene books when it provided for an immediate adversary hearing and judicial decision on the issue of obscenity. In this case, such an adversary hearing was provided and was held, and defendant does not now contend that he was denied the right to have a judicial determination of the issue of obscenity. The defendant was thus provided the procedure to which the Lee Arts Theatre case ruled a defendant in an obscenity case was constitutionally entitled.

■ We reach now the issue of whether the public showing of the motion picture "Night of Lust" violated § 563.280, and without further elaboration we rule that it did. However, defendant contends that by reason of the constitutional guarantee of freedom of expression, and the standards announced by the United States Supreme Court, prosecution under § 563.280 is barred by the provisions of Article I, § 8, Constitution of Missouri, and the First and Fourteenth Amendments relating to freedom of speech and due process of law.

Unlike the analysis of a book or other writing where quotations can be made of passages, and by reference to the text a reasonably accurate summary of the contents can be presented, it is difficult to set forth the contents of a motion picture. Words cannot substitute for the enormous visual impact of a motion picture. The scene of "Night of Lust" is in Paris, and in a grossly inept and extremely shabby manner with poor photography and acting, the picture apparently attempts to portray a clash between two underworld elements or gangs for control of traffic in prostitution and dope. Interlaced throughout the picture, and in most if not all instances without any relation to the plot, if any can be said to exist, are scenes of nude women including closeup portrayals of naked breasts. The picture begins with a "stripper" removing her clothing with the usual gyrations. There is then shown a scene where a girl is taking a shower. She answers the telephone and is strangled to death by an intruder. During the strangulation scene the camera presents a closeup view of the gyrating nude breasts of the victim. A few minutes later a girl is forced into the back seat of an automobile and drugged. One of her captors unbuttons what appears to be a sweater or blouse revealing, again in a closeup portrayal, her gyrating naked breasts, and there occurs what appears to be an attempted sexual assault. Subsequently, at the home or place of operations of a narcotics runner and manager of prostitutes, the picture portrays several girls in various stages of undress, most of them in the nude except possibly for an almost invisible "G-string," apparently smoking pot. During a telephone conversation by the manager the camera focuses on the nude or practically nude girls gyrating their bodies in suggestive sexual movements with the camera again showing closeup pictures of nude breasts. The telephone conversation is in no way related to the subject of the camera. At one time a Negro and a white girl perform a strip duet with obvious homosexual indications. "Night of Lust" is approximately 65 minutes in length, and approximately 40 of those minutes consist of scenes of nude girls in various poses, actions and sequences, which bear no relation to a plot, and apparently are presented for the sole purpose of depicting nude girls in activity suggestive of sexual intercourse or of homosexual activity. The picture ends with a "shoot-out" in what appears to be a park.

A motion picture, if not obscene, is protected by the First Amendment to the United States Constitution as a means of expression. Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495, 72 S.Ct. 777, 96 L.Ed. 1098. However, the right of free speech, which as noted includes the showing of a motion picture, is not an absolute right at all times and under all circumstances, but "is subject to the state's right to exercise its inherent police power." State v. Becker, 364 Mo. 1079, 272 S.W.2d 283; State v. Smith, Mo., 422 S.W.2d 50, 55. For example, obscenity "is not within the area of constitutionally protected speech or press," Roth v. United States, 354 U.S. 476, 485, 77 S.Ct. 1304, 1309, 1 L.Ed.2d 1498, and " 'the primary requirements of decency may be enforced against obscene publications.' " Kingsley Books, Inc. v. Brown, 354 U.S. 436, 440, 77 S.Ct. 1325, 1327, 1 L.Ed.2d 1469. In Freedman v. State of Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649, it was recognized that a motion picture, as distinguished from other media of expression, presents a visual impact which justifies different considerations.

In an opinion by Mr. Justice Brennan in Jacobellis v. State of Ohio, 378 U.S. 184, 84 S.Ct. 1676, 12 L.Ed.2d 793 (in which opinion only Mr. Justice Goldberg joined, but in which four other members of that court concurred in the judgment), an explanation was made of that court's function in its appellate review of obscenity cases as follows: "In judging alleged obscenity the Court is no more 'censoring' expression than it has in other cases 'censored' criticism of judges and public officials, advocacy of governmental overthrow, or speech alleged to constitute a breach of the peace. Use of an approbrious label can neither obscure nor impugn the Court's performance of its obligation to test challenged judgments against the guarantees of the First and Fourteenth Amendments and, in doing so, to delineate the scope of constitutionally protected speech. Hence we reaffirm the principle that, in 'obscenity' cases as in all others involving

rights derived from the First Amendment guarantees of free expression, this Court cannot avoid making an independent constitutional judgment on the facts of the case as to whether the material involved is constitutionally protected." Based on this declaration, and a statement in Manual Enterprises, Inc. v. Day, 370 U.S. 478, 82 S.Ct. 1432, 8 L.Ed.2d 639, that the question of obscenity, "involving factual matters entangled in a constitutional claim, * * * is ultimately one for [that] Court," this Court stated in State v. Vollmar, supra, 389 S.W.2d at p. 28, as previously set out, that in determining the issue of obscenity we "are faced with an obligation to make an independent determination of the constitutional issue which cannot be avoided by considering 'obscenity' as a fact question." Since the question of what constitutes "obscenity" apparently is "ultimately" one for the United States Supreme Court (although at least two members of that court have expressed the view that no group in the United States is "less qualified * * * to know what obscenity is," Ginsberg v. State of New York, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195, 213), we must be guided by its rulings on the issue. However, to demonstrate what may be termed utter confusion and disagreement among the members of that Court, we shall quote from the Per Curiam opinion in Redrup v. State of New York, 386 U.S. 767, 87 S.Ct. 1414, 18 L.Ed.2d 515 as follows: "Two members of the Court have consistently adhered to the view that a State is utterly without power to suppress, control or punish the distribution of any writings or pictures upon the ground of their 'obscenity.' A third has held to the opinion that a State's power in this area is narrowly limited to a distinct and clearly identifiable class of material. Others have subscribed to a not dissimilar standard, holding that a State may not constitutionally inhibit the distribution of literary material as obscene unless '(a) the dominant theme of the material taken as a whole appeals to a prurient interest in sex; (b) the material is patently offensive because

it affronts contemporary community standards relating to the description or representation of sexual matters; and (c) the material is utterly without redeeming social value,' emphasizing that the 'three elements must coalesce,' and that no such material can 'be proscribed unless it is found to be *utterly* without redeeming social value.' * * * Another Justice has not viewed the 'social value' element as an independent factor in the judgment of obscenity." In the Redrup case a majority concurred in the *result* that the distribution of certain paperbound books and magazines was "protected by the First and Fourteenth Amendments from governmental suppression." Two members of the Court dissented. It cannot be said that a *majority* of the Court has approved any of the "views" set forth in the Redrup opinion. The result of the opinion in the Redrup case was that the material under consideration could not constitutionally be adjudged obscene, an issue *not briefed* before that Court. There was no discussion of the reasoning and no explanation of the contents of the material. The only conclusion that can be reached from the cases ruled by the United States Supreme Court following the Roth case is that, while it proclaims itself to be the "ultimate" judge of obscenity, a majority of the Court cannot agree on a formula for that determination. In other words, as beauty is to the eye of the beholder, so is obscenity.

Notwithstanding the various views of the individual members of the Supreme Court as disclosed by the Redrup case (three of whom are no longer on that Court), this Court should not be required to apply every test or standard devised by each individual member. In our independent determination of the constitutional issues we should apply the principles on which that Court has spoken as a majority. Some of those principles are set forth in Roth v. United States, supra, as follows: "The protection given speech and press was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.

* * * All ideas having even the slightest redeeming social importance—orthodox ideas, controversial ideas, even ideas hateful to the prevailing climate of opinion— have the full protection of the guaranties, unless excludable because they encroach upon the limited area of more important interests. But implicit in the history of the First Amendment is the rejection of obscenity as utterly without redeeming social importance. This rejection for that reason is mirrored in the universal judgment that obscenity is not within the area of constitutionally protected speech or press. * * * However, sex and obscenity are not synonymous. Obscene material is material which deals with sex in a manner appealing to the prurient interest. The portrayal of sex, e. g., in art, literature and scientific works, is not itself sufficient reason to deny material the constitutional protection of freedom of speech and press." It is then stated that the test of whether material is obscene, and therefore without the protection of the First Amendment, is "whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest." Later cases, including Manual Enterprises, Inc. v. Day, 370 U.S. 478, 82 S.Ct. 1432, 8 L. Ed.2d 639 (in which the opinion was joined in by only one other justice, but in which four concurred "in the decision" or "the reversal," one justice dissented, and two took no part), and Jacobellis v. State of Ohio, supra, (in which only one justice joined in the opinion, two concurred "in the reversal of this judgment," two were recorded as "concurring," and three justices dissented) contain language (but not approved by a majority) to the effect that "contemporary community standards" as that term is used in the Roth case relates to a national standard. In a dissent in the Jacobellis case by the then Chief Justice, it was logically and persuasively pointed out that "there is no provable 'national standard,' and perhaps there should be none." The unique argument is advanced by Mr. Justice Brennan that a standard

based on a particular local community would have the effect of "denying" to another community material considered to be obscene in the former. The inevitable result of such a principle, if ever adopted by a majority of the Supreme Court, would be to establish that the lowest local community standard in the nation must be recognized as the national standard. We do not know what the "national standard" is or how to determine it except to say, according to the formula of Mr. Justice Brennan, that it is the lowest that can be found, which in the absence of compulsion by a majority of the Supreme Court we decline to do. We can and do understand "contemporary community standards" as that term is used in the Roth case.

Under no possible standard could the motion picture "Night of Lust" be related to art, literature or scientific works. It is the portrayal of nude women, which when considered alone may not be considered obscene according to language in Manual Enterprises, Inc. v. Day, supra, or obscene for adults. Ginsberg v. State of New York, supra. However, that is not the limits of the portrayal in "Night of Lust." By reason of the closeup scenes, and by use of nude body gyrations and undulations the motion picture suggests promiscuous sexual intercourse and homosexual activity which is totally unrelated to any plot. Such scenes are patently offensive and are incorporated into the picture only to appeal to the prurient interest of the viewer. Such portrayals are not "fragmentary and fleeting," Jacobellis v. State of Ohio, supra, but because of the quantity of such portrayals, the result is that the dominant theme of the picture, when considered as a whole, is the suggestion of promiscuous sexual intercourse and homosexuality.

Applying the principles of the Roth case, and applying the standard of review set forth in State v. Vollmar, we find "Night of Lust" to be obscene.

However, in Manual Enterprises, Inc. v. Day, supra, and in Redrup v. State of New York, it is stated in the opinions which governed the result of those cases (but not concurred in by a majority of that Court) that "prurient interest appeal" announced in the Roth case is not the sole test of obscenity. In the Redrup case there was then set out the views of the justices, as previously quoted. In the Manual Enterprises case, the author of the opinion governing the result there reached recognized that the two elements of patent offensiveness and prurient interest appeal "tend to coalesce, for that which is patently offensive will also usually carry the requisite 'prurient interest' appeal," and we conclude and find that to be true in this case. The question then remains whether "Night of Lust" must, as stated in the Redrup opinion, be found to be "utterly without redeeming social value."

In the dissenting opinion of Mr. Justice Clark in A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Attorney General of the Commonwealth of Massachusetts, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1, he pointed out that there was no majority opinion in that case, and that three members of the court had purported to add a new test to that announced in the Roth case, namely, that a "book cannot be proscribed unless it is found to be *utterly* without social value." It was further pointed out that such a condition "gives the smut artist free rein to carry on his dirty business," and that the "first reference to such a test was made by * * [Mr. Justice] Brennan in Jacobellis v. Ohio," supra, in an opinion concurred in only by Mr. Justice Goldberg. In another dissenting opinion in the Memoirs case, Mr. Justice White states that "If 'social importance' is to be used as the prevailing opinion uses it * * *, obscene material, however far beyond customary limits of candor, is immune if it has any literary style, if it contains any historical reference or language characteristic of a bygone day, or even if it is printed or bound in an interesting way. Well written, especially effective obscenity is protected; the poorly written is vulnerable. And why shouldn't

the fact that some people buy and read such material prove its 'social value'?"

A majority of the United States Supreme Court has not pronounced that an element of the test of obscenity includes the "social value" requirement as stated by Mr. Justice Brennan. We are not convinced that such a test will be adopted by a majority of the United States Supreme Court, at least with the far-reaching effect set forth in United States v. A Motion Picture Film Entitled "I Am Curious-Yellow," 2d Cir., 404 F.2d 196. With such a test as an element of obscenity, all the dealer in obscene material need do is to incorporate at some place in an hour long production of the most disgusting and degrading filth and obscenity, an obscure recitation, even if done in jest or in a degrading manner, of the Sermon on the Mount and the production could not constitutionally be held to be obscene. This, in effect, is precisely what happened in this case by presenting approximately 40 minutes of obscenity, with no purpose but to appeal to the prurient interest, but injecting it into a totally unrelated factual situation which some might, and the defendant in this case does, argue could be interpreted to teach the evils of dope, prostitution and underworld gang warfare. Absent compulsion, we decline to apply a rule of "social value" to the extent argued by defendant and implied in the opinions in the Jacobellis and Manual Enterprises cases, which have not been adopted by a majority of that Court. We agree with the statement of Mr. Justice White in his dissent in the Memoirs case that " 'social importance' is not an independent test of obscenity but is relevant only to determining the predominant prurient interest of the material, * * *." When so considered, "Night of Lust" is obscene, and we so hold.

Defendant next contends that there was insufficient evidence of several matters to authorize a conviction in an obscenity case in that there was no proof (a) that he had the requisite scienter, (b) that he had pos-session of the film, (c) that the motion picture violated the standards of the community, (d) that he engaged in any illegal conduct, and (e) that the motion picture was obscene. We have previously held that the motion picture "Night of Lust" is obscene. If defendant had the requisite scienter and possession, he engaged in illegal conduct. Therefore, we need consider only the first two contentions.

Defendant was the president and treasurer of the Olympic Drive-In Theater, Inc. The motion picture was shown at the theater while defendant was present, although not in the projection booth. The projectionist received instructions from defendant, and the total circumstances clearly indicate that he was in charge of the operations of the theater. "Neither ownership [of the film] nor actual physical possession is necessary to constitute 'possession' within the meaning of" § 563.280, State v. Smith, Mo., 422 S.W. 2d, at p. 68. The trial court found that defendant had possession of the film, and that finding was supported by the evidence.

In Smith v. People of State of California, 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205, referring to a Los Angeles ordinance, the Court said: "The definition included no element of scienter-knowledge by appellant of the contents of the book— * * *." and later, "Eyewitness testimony of a bookseller's perusal of a book hardly need be a necessary element in proving his awareness of its contents. *The circumstances may warrant the inference that he was aware of what a book contained*, despite his denial." (Emphasis added). In State v. Vollmar, supra, this Court held that some knowledge of the nature of the contents of the publication was sufficient to constitute scienter. Also, it is not necessary that the State prove that the defendant considered the film to be obscene. State v. Smith, supra, 422 S.W.2d at p. 62. In this case, previews of the motion picture "Night of Lust" had been shown at the Olympic Theater during the week preceding the arrest when defendant was in the area

of the projection booth and concession stand, which was under one roof. Also on the night the motion picture was shown, and the arrest was made, defendant was at the projection booth-concession stand area, and seeing the film for only a matter of minutes at any stage of the picture would make one aware of the general nature of the film. The trial court found that defendant "was aware of the contents" of the film "Night of Lust." That finding has support in the evidence, and we agree.

■ Defendant next contends that the trial court erred in refusing to permit defendant to introduce evidence of expert witnesses and comparable motion pictures because such evidence "is constitutionally admissible in cases of this nature." Defendant made an offer of proof that he had two motion pictures, "I, A Woman" and "The Lovers" as comparables, and two "expert" witnesses, presumably on the issue of obscenity; one an anthropologist and the other a professor of English literature. Defendant relies on statements by the Chief Justice in a separate concurring opinion in I. M. Amusement Corp. v. State of Ohio, 389 U.S. 573, 88 S.Ct. 690, 19 L.Ed.2d 776, and statements in separate concurring opinions by Justices Frankfurter and Harlan in Smith v. People of the State of California, supra, (in which there was a principal opinion and four separate concurring opinions), to the effect that the right to introduce such evidence in an obscenity case is required by due process. However, in neither of those cases was the issue ruled by a majority of the Court. Defendant also cites Yudkin v. State of Maryland, 229 Md. 223, 182 A.2d 798, and United States v. Klaw, 2d Cir., 350 F.2d 155, which support his contention. We note that in the Klaw case it was pointed out that "the [United States Supreme] Court has definitely accepted the responsibility of being the final arbiter and has refused to accept the judgment of officials, judges or juries to the contrary," and that "the burden on [that] court [in deciding the Klaw case] at [the] appellate stage should

be no less." Of course, the burden on this court in the pending case would be no less. In that event, the relevant question presented is why should there be any expert testimony, and how could there be prejudice in refusing it?

In State v. Smith, supra, 422 S.W.2d at p. 58, this Court considered the question of whether it was error to refuse "expert" testimony on the issues of community standards and obscenity and ruled as follows: "Expert testimony that a publication conforms to general community standards and is not obscene is not within the proper scope of expert testimony. State v. Vollmar, supra, 389 S.W.2d 29 [25]; State v. Becker, supra [364 Mo. 1079, 272 S.W.2d 283]. In [the] Vollmar [case] it was reasoned that judges and jurors have knowledge concerning the general community standards relating to moral conduct and obscenity; and that in the field of obscenity the average citizen is as capable of judging a publication 'as an alleged expert.' In assessing whether a publication is obscene or whether it conforms to contemporary community standards of decency and morality the courts are concerned with the dominant theme as it appears to the *average* person— not as it may be considered by the small segment of the population represented by the 'experts' who testified for appellant— sophisticated, cultivated, highly educated, widely traveled and worldly-wise members of the intelligentsia whose judgment as to the reactions of the *average* person who [sees or reads the material] * * * is of questionable, if any, value. * * * The erudite and sophisticated may be cultivated to the point where they are not affected by erotica or may be impervious to the storms of aroused passion. We are confident, however, that the *average* person is not so finely tuned or so smugly insulated." In the Smith case, which involved the book "Candy," the appellant there offered other books as comparables, and it was held: "As indicated in [Jacobellis v. State of Ohio, supra,] the ultimate decisions in obscenity cases must be made on a case-to-case basis. It must be recog-

nized that no two books are alike. Each must be judged on its own merits or demerits. We cannot decide the issue before us by comparing Candy with some other book. The test is not whether Candy is less objectionable than Fanny Hill, et al. The test is whether as a matter of law *Candy* is nonobscene. Ours must be an independent determination as to the propriety of Candy under the governing rules. We must adhere to our own judgment of Candy rather than rely upon the judgment of other judges passing on other books."

For the reasons set forth above, we adhere to the rules announced in the Smith case, and find no prejudicial error in the refusal of the trial court to hear "expert" testimony and to view so-called comparables.

■ Defendant next contends that the "court erred in permitting testimony concerning alleged admissions by defendant because of failure to warn him of his Miranda rights."

Lieutenant Wessell, one of the arresting officers, testified that after defendant was arrested he gave an answer to a question before he was advised "of his rights." The question asked him was, "Are you the manager?" Over defendant's objection the officer was then permitted to state that in response to the question defendant "indicated that he was." Counsel for defendant then objected "on the ground that the officer [answer?] was not responsive to the question and it was a conclusion more than it was a response." The court ruled: "As to that portion I will sustain that. That was not responsive to the question." Following some discussion, the witness was asked: "What [were] the words exactly?" and the answer was, "I don't recall."

Defendant argues that because of the above, and because subsequently in *argument* to the court on another matter the prosecuting attorney referred "to the testimony previously given that he was the manager," and stated that "the evidence is he was the manager," that the Miranda rule was violated.

An objection was sustained to the only *testimony* to the effect that defendant said or indicated he was the manager, and *argument* of counsel cannot constitute evidence or be substituted for the testimony of a witness. The prosecuting attorney may have been wrong as to what the evidence was, and if defendant thought he was aggrieved by that argument he could have replied and pointed out to the court that the objection had been sustained. We find no violation of the Miranda rule.

■ Finally, defendant asserts that the court erred in imposing a more severe sentence than he originally received in the magistrate court. He relies primarily on State of North Carolina v. Pearce, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656.

Charged with a misdemeanor, defendant was first tried in the magistrate court and there found guilty by a jury which also determined the punishment to be a fine of $500. Pursuant to Supreme Court Rule 22.10, V.A.M.R., the defendant took an appeal to the circuit court, where by reason of Supreme Court Rule 22.16, "the case [was] heard, tried and determined de novo * * * as though the prosecution had originated in that court." In the circuit court the defendant could have had a trial before a jury which would have determined the issue of guilt and also determined the punishment in the event of a verdict of guilty. In fact, one such trial was held, but it resulted in a mistrial when the jury failed to reach a verdict. At the second trial defendant waived a jury trial, and the case was tried before the court which heard the case de novo and determined the issue of guilt, and it assessed the punishment at a fine of $1,000 and confinement in the county jail for three months.

Assuming that the rule announced in State of North Carolina v. Pearce is applicable, the United States Supreme Court

has not held that it is to be applied retroactively, and our view is that it should not. It was expressly held not to be retroactive in Wayne v. State, 8 Md.App. 5, 257 A.2d 455. The judgment of the circuit court in this case was entered prior to the opinion in the Pearce case.

In addition, in the Pearce case it was ruled that "neither the double jeopardy provision nor the Equal Protection Clause imposes an absolute bar to a more severe sentence upon reconviction," but "Due process of law * * * requires that vindictiveness against a defendant for having successively attacked his first conviction must play no part of the sentence he receives after a new trial." The Pearce case applied to the factual situation where a prior conviction was set aside upon appeal because of error and a new trial ordered, and it was held that "whenever a judge imposes a more severe sentence upon a defendant after a new trial, the reasons for his doing so must affirmatively appear." How the circuit judge in this case could have been expected to anticipate such a procedural requirement is not apparent. In addition, we note that defendant makes no claim whatever that the trial judge acted through vindictiveness, was prejudiced, or

that he was motivated in determining the punishment by the fact that defendant had appealed from the conviction in the magistrate court. See Moon v. State of Maryland, 395 U.S. 975, 89 S.Ct. 2135, 23 L.Ed. 2d 764. His contention is that the fact alone of the increased punishment violates the rule in the Pearce case, and it does not. We are also of the opinion that neither the reasoning nor the facts of the Pearce case apply to the situation we have here where, after a conviction in a magistrate court and without contending that any error there occurred, a defendant may obtain a trial de novo in the circuit court and there waive a trial by jury, and in that manner bind the judge to the punishment imposed by the jury in the magistrate court.

The judgment is affirmed.

PER CURIAM:

The foregoing opinion by STOCKARD, C., is adopted as the opinion of the Court.

All concur except SEILER, J., who dissents.

BARDGETT, J., not participating in the decision of this cause because not a member of the Court when the subject movie was viewed by the Court.